IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:13-CR-00274-ODE-JFK-3 |
| CHANDERPERSAD KANDHAI, | |
| Defendant. | |

**REPORT AND RECOMMENDATION**

Pending before the court are Defendant Chanderpersad Kandhai's motion [Doc. 17] to suppress custodial statement and motion [Doc. 26] to suppress statement and evidence. Due to the fact that the Government does not intend to use in its case-in-chief at trial any custodial statements made by Defendant after his April 27, 2013, arrest [Doc. 32 at 67-68], Defendant has withdrawn the motion to suppress those statements, and the court deems the motion [Doc. 17] moot. With respect to the motion to suppress statements and evidence, that motion pertains to events occurring at the Atlanta Hartsfield-Jackson International Airport on April 27, 2013. [Docs. 26, 34]. Defendant seeks to suppress evidence, including packages of cocaine seized from his luggage, and statements that he made to Customs and Border Patrol officers on that date. [Doc. 26].

AO 72A
(Rev.8/82)

An evidentiary hearing was held on the motion to suppress on January 28, 2014. [Doc. 32].[1] The Government opposes the motion to suppress. [Doc. 36]. For the reasons stated herein, the court recommends that the motion to suppress be denied.

**I.    Facts**

In 2013, Agents and Task Force Officers ("TFO") assigned to the Drug Enforcement Administration ("DEA") and to Homeland Security, Immigration and Customs Enforcement ("ICE"), were investigating an individual located in Spain, Sandro Ortiz-Guzman ("Guzman"), who was using couriers to import controlled substances into the United States. (Tr. at 4-6, 11, 14, 40). TFO T.K. Gordon was receiving information from a confidential informant ("CI") about the importation of drugs, including information about the couriers and their itineraries.[2] (Tr. at 6-11). The

---

[1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

[2]TFO Gordon believed the CI to be reliable based on the historical information he had previously provided and because, based on other information provided about the importation scheme, five or six cases had been investigated resulting in arrests and seizures of drugs. The CI passed on to the TFO Blackberry messenger and email information which provided details about the couriers and their travel plans. When a courier was ready to travel to the United States, Guzman provided the CI an email address, user name and password which, when accessed, disclosed the courier's identity, photographs of the luggage containing the drugs and flight itinerary. (Tr. at 6-11). The CI was cooperating with law enforcement to receive benefit in a case, and he did obtain a 5K sentencing departure. (Tr. at 10-11).

2

CI, under TFO Gordon's supervision, negotiated with Guzman for the delivery of a quantity of cocaine to be imported from Ecuador to the United States. Approximately one week before April 27, 2013, the CI received a Blackberry message alerting him to the expected arrival of the courier. (Tr. at 11). Then a few days before April 27, the CI received the information necessary to access the email account. The TFO accessed this information. (Tr. at 11-13, 40-41).

From the email, TFO Gordon obtained the Dutch passport photograph of Defendant Kandhai, a photograph of the bag containing the drugs, and the flight itinerary for Defendant's travel from Quito, Ecuador. (Tr. at 11-13, 24, 29-30; Gov't Exs. 1, 2). A day or so before the planned travel, Guzman sent the CI a change of travel plans, delaying Defendant's travel by one day to April 27th. (Tr. at 13-14). TFO Gordon, in addition to providing this information to ICE Agent Harold Hawkins, provided the information to Customs and Border Patrol ("CBP") officers working at the Atlanta Hartsfield-Jackson International Airport ("HJIA") - including providing copies of Defendant's photograph and the photograph of the bag. (Tr. at 14-15, 40-42, 54).

On April 27, 2013, the agents confirmed that Defendant Kandhai was on the flight from Quito, Ecuador, and, along with CBP officers, were waiting at the international terminal gate, F-1, where the flight was scheduled to arrive after landing

3

in the United States. (Tr. at 15-16, 41-42, 54; Gov't Ex. 4). After the flight arrived at the gate and as the passengers deplaned, TFO Gordon, ICE Agent Hawkins and the CBP officers observed the luggage on the flight being removed from the plane. They observed the bag depicted in the photograph; however, the bag had been completely wrapped in clear plastic, saran wrap. A photograph was taken of the bag at that time. (Tr. at 16, 43-44, 54). Under CBP escort, Defendant's bag along with the rest of the luggage on the plane was taken to the Delta baggage room - an area that passengers are not allowed to access. (Tr. at 44, 60). After observing the bag being taken off the plane, TFO Gordon proceeded to baggage claim and waited for Defendant. He subsequently observed Defendant, who had cleared the immigration processing area, in baggage claim. (Tr. at 16).

Due to the fact that Defendant and the bag arrived on an international flight, HJIA was the first opportunity for a Customs inspection of the bag. (Tr. at 41). The bag was subject to a Customs search from the time it was removed from the plane until the passenger and bag were allowed to leave the Customs area of the airport. (Tr. at 41-44). As passengers deplane an international flight, their checked luggage is removed from the plane and taken to a baggage room where, if not subjected to inspection, the luggage is placed on a conveyer belt for delivery to the baggage claim carousels in the

4

Customs area.  (Tr. at 43-45).  International passengers first present travel documents at the immigration inspection station, and, unless a passenger is referred to secondary inspection, they then proceed to baggage claim to collect their checked luggage. Finally, with that luggage, passengers present themselves for Customs inspection.  (Tr. at 46-47, 49-51).  Every passenger who arrives on an international flight is subject to some level of inspection, and all luggage that arrives on such a flight is subject to inspection.  (Tr. at 46).  An international traveler does not enter the United States until after presenting his or her declaration and passing through the final Customs inspection area.  (Tr. at 48).

In this case, due to the information about Defendant and the bag, while the bags remained under CBP control, all of the luggage on Defendant's flight was inspected in the baggage room by a K-9 used by CBP to detect drugs.[3]  (Tr. at 44-46, 51-52, 54-55, 59-60).  The K-9 alerted to Defendant's bag.  (Tr. at 46, 55).  CBP officers then removed the saran wrap and unzipped the bag.  Inside the bag, wrapped in fabric, the officers found a number of packages of suspected cocaine.  The bag and cocaine packages were photographed.  (Tr. at 46, 55-56; Gov't Ex. 3, 5, 6).  The packages were

---

[3]The CBP officers did not immediately inspect the bag as it was removed from the plane to avoid disclosure of the investigation - passengers on the plane would have been able to observe that search.  (Tr. at 43).

5

placed back into the bag - nothing was removed from the bag and nothing else was added to the bag - and the bag was closed. (Tr. at 56-57). The agents and officers then alerted the other agents waiting in baggage claim about finding the cocaine and that the bag, without the saran wrap, was being placed on the conveyer belt to go downstairs and onto carousel 2, where all of the luggage for Defendant's flight was being delivered for passengers to claim. (Tr. at 44, 49, 57, 61). The officers remained in contact with the agents in baggage claim until the agents reported seeing the bag. (Tr. at 17, 57). The initial search of the bag required three to four minutes, and Defendant's bag arrived on the carousel at approximately the same time as the rest of the luggage for the flight. (Tr. at 58, 61). TFO Gordon observed the bag arrive in baggage claim and did not observe anyone open or tamper with the bag before it was taken by Defendant to the Customs inspection area. (Tr. at 18, 34).

Defendant claimed the bag and, when he arrived at the Customs inspection area, he was referred to secondary. (Tr. at 18-19, 58, 62). Pursuant to routine, at secondary inspection, the CBP officer asked Defendant if the bag was his and did he claim the contents; Defendant responded yes to both questions. (Tr. at 58, 62). The CBP officer

6

opened the bag and found the packages of cocaine inside.[4] (Tr. at 19, 58, 62-63). All of the inspections of Defendant's bag occurred before he exited the Customs area of the HJIA. (Tr. at 20, 48). In addition to the cocaine, on Defendant's person, CBP officers found a receipt for saran wrap from the Quito airport, a claim check for the bag, two cellular telephones and a credit card issued by a foreign bank. (Tr. at 36-37, 61).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress.

**II.   Discussion**

Defendant contends that the evidence obtained during the border searches of his luggage should be suppressed because the Government has not established with a reasonable certainty that there was no change in the bag after it crossed the border, citing United States v. Hill, 939 F.2d 934, 937 (11th Cir. 1991), and that the searches were unreasonable because Defendant was not informed about the initial search and the searches prolonged Defendant's detention, citing United States v. Place, 103 S. Ct. 2637 (1983).[5] [Doc. 34 at 5-8]. The Government responds that the searches of

---

[4]There is no evidence that Defendant made any further comments or was asked any further questions. (Tr. at 62-63).

[5]Defendant makes no arguments regarding the admissibility of his statements prior to the search of his bag at the Customs secondary inspection area or of the items

7

Defendant's bag in this case constituted routine border searches and that the evidence establishes that the bag was under constant surveillance, that the Government was under no obligation to advise Defendant about the initial search, and that the searches did not unreasonably prolong Defendant's time in Customs. [Doc. 36 at 7-14]. Defendant's arguments are meritless.

While the Fourth Amendment dictates that searches and seizures be reasonable, "[w]hat is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya De Hernandez, 105 S. Ct. 3304, 3308 (1985). Due to Congress' broad powers to police the border, see United States v. Ramsey, 97 S. Ct. 1972, 1978-79 (1977), "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior[,]" Montoya,105 S. Ct. at 3309. As the Supreme Court recently reiterated:

> Time and time again, we have stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.".
> . . Congress, since the beginning of our Government, "has granted the Executive plenary authority to conduct routine searches and seizures at the

---

seized from his person. [Doc. 34].

border, without probable cause or a warrant, in order to . . . prevent the introduction of contraband into this country."

United States v. Flores-Montano, 124 S. Ct. 1582, 1585 (2004) (citations omitted).

Therefore, although a defendant is entitled to be free from an unreasonable search and seizure, his expectation of privacy is less at the border, and "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." Montoya, 105 S. Ct. at 3309-10; see also United States v. Alfaro-Moncada, 607 F.3d 720, 728 (11th Cir. 2010) (same); United States v. Villabona-Garnica, 63 F.3d 1051, 1057 (11th Cir. 1995) ("Border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment; rather, they are simply subject to that amendment's more amorphous reasonableness standard."). The HJIA, an international airport, is the functional equivalent of the border for passengers arriving at F concourse on international flights, see Denson v. United States, 574 F.3d 1318, 1339 (11th Cir. 2009), and United States v. Buonsignore, 131 Fed. Appx. 252, 257 (11th Cir. 2005); therefore, Defendant's expectation of privacy is greatly reduced due to the fact that he and his possessions "entered the United States from the outside[,]" United States v. Masesa, 218 Fed. Appx. 880, 882 (11th Cir. 2007).

9

Accordingly, no articulable suspicion is required for routine border searches, such as questioning, luggage searches and pat-downs or frisks, which only intrude slightly on a person's privacy.  See Alfaro-Moncada, 607 F.3d at 728 (as part of a routine border search, a person may be subjected to a pat-down or frisk and his luggage inspected without any level of suspicion); United States v. Glover, 353 Fed. Appx. 314, 317 (11th Cir. 2009) (the CBP "officer may conduct routine questioning, check luggage, and conduct a pat-down search without any level of suspicion"); Denson, 574 F.3d at 1340 (preliminary border search may include routine questioning, examination of luggage and pat-downs or frisks); Masesa, 218 Fed. Appx. at 882 (same).  These searches can be legitimately conducted with no more than a generalized "mere suspicion" or "subjective response" of the border inspector, and in fact, "[a] person's decision to cross our national boundary is justification enough for such a search." United States v. Vega-Barvo, 729 F.2d 1341, 1345 (11th Cir. 1984); see also Alfaro-Moncada, 607 F.3d at 728; Glover, 353 Fed. Appx. at 317.[6]

---

[6]For highly intrusive detentions and searches at the border, which did not occur in this case, the Supreme Court in Montoya, which involved an internal body smuggle of drugs, established a reasonable suspicion standard for the decision to detain an individual beyond the routine border search and inspection. See 105 S. Ct. at 3310.  In Villabona-Garnica, the Eleventh Circuit Court of Appeals stated, "We have 'applied this reasonableness requirement by adopting a flexible test which adjusts the strength of suspicion required for a particular search to the intrusiveness of that search.'"  63

Defendant does not contest that both searches of his bag were part of a routine border search or that the Government was not required to establish reasonable suspicion to justify the searches.[7] Defendant arrived at the HJIA on an international flight from Ecuador, and he and his bag were subject to both immigration and customs inspection at any time before he was allowed to exit the Customs area of the airport. (Tr. at 13, 15-17, 41-44, 48, 50-51). The bag was initially searched by CBP officers before being sent to the baggage claim area of Customs. (Tr. at 17, 31, 44, 46, 54-56). Then, after Defendant claimed the bag, CBP officers conducted a secondary inquiry and inspection

---

F.3d at 1057 (citation omitted). For example, to conduct a strip search or an x-ray of an international traveler, officers must have articulable, reasonable suspicion of wrongdoing. Denson, 574 F.3d at 1341 ("If, after conducting initial questioning and a preliminary search of the individual and the individual's effects, the officer has a reasonable suspicion that the traveler is smuggling drugs in her alimentary canal, the Fourth Amendment permits the Customs officer to detain the individual and conduct a more intrusive search."); Masesa, 218 Fed. Appx. at 882 ("a customs agent must have a reasonable suspicion before conducting a more intrusive, non-routine border search, such as an x-ray examination"); United States v. Rodriguez, 74 F.3d 1164, 1164-65 (11th Cir. 1996) (permitting government, upon establishing reasonable suspicion that traveler is internal drug smuggler, to "detain the traveler until enough time has passed to allow the contents of the suspected smuggler's stomach to be excreted").

[7]However, the court notes that the Government established reasonable suspicion - if not probable cause - to support the searches in this case. The court finds that a reliable CI provided detailed information about the importation scheme involving Guzman and Defendant and that the Blackberry messenger and emails sent regarding Defendant's travel substantiated that Defendant's bag would contain quantities of controlled substances. (Tr. at 6-14, 24, 29-30).

11

which included searching the bag in Defendant's presence. (Tr. at 18-19, 32-33, 58, 61-63). All of these actions fall within the scope of routine border searches. See Masesa, 218 Fed. Appx. at 882 (the Eleventh Circuit Court of Appeals held that both the initial stop and the secondary inquiry "were part of the initial border investigation" and stated that "[t]his second phase of inquiry was merely an extension of the initial border search . . ."); United States v. Jerome-Oboh, 883 F. Supp. 917, 922 (W.D. N.Y. 1995) (rejecting the defendant's argument that officers needed "requisite level of suspicion" to refer him to secondary inspection for a pat-down and stating that "[t]he referral of a person entering this country to a secondary inspector is part of the routine border interrogation") (quoting United States v. Henry, 604 F.2d 908, 920 (5th Cir. 1979), abrogated on other grounds United States v. Corral-Franco, 848 F.2d 536 (5th Cir. 1988)) (internal quotation marks omitted).

As stated, the international terminal at the HJIA is the functional equivalent of the border. Hill, 939 F.2d at 936 ("Places such as international airports within the country . . . exemplify such functional equivalents."). Defendant really does not contest the conclusion that, by arriving on the flight from Ecuador at the HJIA, he was attempting to enter the United States and was required to proceed through both immigration and customs inspection. (Tr. at 41-44, 46-48, 49-51). As is true of all

12

arriving passengers and luggage, Defendant and his bag were subject to inspection and search before he was allowed to enter the United States. (Tr. at 46-48, 49-51). Defendant, in fact, never exited from the Customs area of the airport. (Tr. at 48). Instead, utilizing the test set forth in Hill for determining whether a search occurred at the functional equivalent of the international border, Defendant attempts to argue that the search of his bag was unreasonable. [Doc. 34 at 5-6]. Defendant's reliance on Hill is unpersuasive.

In cases where questions may arise as to whether a border search was conducted, the Eleventh Circuit Court of Appeals has established that three elements must be met to demonstrate that a search was conducted at the functional equivalent of the border: "1) reasonable certainty that the border was crossed; 2) no opportunity for the object of the search to have changed materially since the crossing; and 3) the search must have occurred at the earliest practicable point after the border crossing." Hill, 939 F.2d at 937. The facts in this case establish that the Government easily met each of these elements. Defendant arrived at the HJIA on an international flight from Ecuador. (Tr. at 13-15). The arrival at gate F-1 of the international terminal presented the first practical place that the passengers and the luggage on the plane could be searched. (Tr. at 41-42). Defendant's bag was observed being removed from the plane. The bag,

13

along with the rest of the luggage from the plane, was taken under CBP escort to the Delta baggage room. (Tr. at 15-16, 44, 54). While still under CBP control, Defendant's bag and all other luggage from the plane was inspected by a CBP K-9. The K-9 alerted to Defendant's bag which was then inspected by CBP officers. (Tr. at 45-46, 54-56). The officers removed the saran wrap from the bag, opened the bag, and found wrapped inside fabric located in the bag the packages of cocaine. (Tr. at 55-56). The court sees absolutely no uncertainty that Defendant's bag remained unchanged since crossing the border.

And, to the extent it is material to the motion to suppress, since the cocaine had been discovered, the facts demonstrate that there was no opportunity for the bag to materially change before the Customs secondary inspection. After completing the search, the CBP officers placed the cocaine packages back in Defendant's bag. Nothing else was added to the bag and nothing was removed. (Tr. at 56-57). The bag was closed and placed on the conveyer belt along with the remaining luggage from Defendant's flight. (Tr. at 57-58, 61). The CBP officer alerted the agents waiting in baggage claim, who were watching Defendant, that the cocaine had been found and that the bag was on the conveyer belt and heading down to carousel 2 in baggage claim. (Tr. at 49, 57, 61). The officer remained on the line for the few minutes until the agents

14

in baggage claim observed the bag and observed Defendant retrieve the bag.  (Tr. at 16-17, 57).  The bag was not opened before being presented at secondary inspection.  (Tr. at 18).  The bag remained under surveillance until inspected a second time by CBP officers, and the packages of cocaine were again found and this time seized.  (Tr. at 18-19, 58).  The facts in this case establish a valid search at the functional equivalent of the border.  See United States v. Santiago, 837 F.2d 1545, 1548 (11th Cir. 1988).

Defendant's remaining arguments, that the initial search was unreasonable because he was not informed of the search and that the searches unreasonably prolonged his detention are also unpersuasive.  Defendant's reliance on the Supreme Court decision in Place is misplaced. The decision in Place is factually inapposite to a border search and to the factors that are weighed by a court in determining whether a search at the border is reasonable.

In United States v. Cotterman, 637 F.3d 1068 (9th Cir. 2011), the Ninth Circuit Court of Appeals, in a case involving a border search, rejected the dissenting judge's reliance on Place "for the proposition that 'detention of luggage within the traveler's immediate possession . . . intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary.'"  Id. at 1078 n.11 (citation omitted).  The court stated "that Place - decided not in the context of a

15

border search but under run-of-the-mill domestic circumstances - stands only for the rather unremarkable proposition that individuals *within our borders* have a reasonable expectation of privacy in their possessions." Id. (emphasis in original).  This court, as did the court in Cotterman, "decline[s] to confuse border searches with their domestic counterparts." Id.  Defendant has not cited the court to any authority - nor has the court found any - that applies Defendant's arguments within the context of a border search. And Defendant's reliance on Place to argue that the searches in this case unreasonably extended his detention in Customs fairs no better.

First, the evidence does not establish that either search caused Defendant undue delay.  CBP Officer Horton testified that the initial search of Defendant's bag required three to four minutes and that the bag arrived at the baggage carousel along with most of the luggage from Defendant's flight.  (Tr. at 58, 61).  After that search, the agents and officers frankly had probable cause for Defendant's arrest and, although not necessary, sufficient cause to further search the bag during the secondary inspection. The facts do not establish any undue delay in commencing and completing the secondary inspection. (Tr. at 18-19, 57-58).  In United States v. Mosquera-Ramirez, 729 F.2d 1352 (11th Cir. 1984), the Eleventh Circuit Court of Appeals distinguished the circumstances underlying the finding in Place that a ninety minute detention of a

16

domestic flyer's luggage[8] was unreasonable from the facts of the border search under consideration in that case. Id. at 1355-56. Finding that the factors considered in the context of a border search were "far different from those" before the Supreme Court in Place, the court declined to adopt the defendant's arguments. Id. As the court noted, "At the border, a person may be detained long enough for the officials to determine they are entitled to enter the United States." Id. at 1356; and see Cotterman, 637 F.3d at 1078 ("[T]he [Supreme] Court has indicated that travelers [at the border] should expect intrusions and delay in order to satisfy the Government's sovereign interest in protecting our borders from those who would wish to do us harm.") (citing Flores-Montano, 124 S. Ct. at 1587 n.3).

The court finds that the CBP officers conducted routine border inspections of Defendant's bag, both in the Delta baggage room and at the Customs secondary inspection area, after Defendant arrived at the international terminal at the HJIA, the functional equivalent of the border. The searches were reasonable under the

---

[8]Even if the decision in Place was instructive in addressing Defendant's argument in this case, there is absolutely no evidence to support a finding that the detention of Defendant, due to the bag searches and before he was placed under arrest, approached a period of ninety minutes.

17

circumstances presented, and accordingly, Defendant's motion to suppress is due to be denied.

### III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 26] be **DENIED** and that the motion [Doc. 17] to suppress custodial statements be **DENIED** as **MOOT**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendant.

**IT IS SO RECOMMENDED AND ORDERED**, this 1st day of April, 2014.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE